**BODY SUPPORT SYSTEMS, INC., Plaintiff,**

v.

**BLUE RIDGE TABLES, INC., Defendant.**

No. 1:96CV161–D–D.

United States District Court,
N.D. Mississippi,
Eastern Division.

July 25, 1996.

J. Stephen Wright, Jackson, Mississippi, J. David Fine, Ashland, Oregon, for Plaintiff.

James E. Price, III, Corinth, Mississippi, for Defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This cause comes before the court upon the plaintiff's request for a preliminary injunction based upon several different theories. After presiding over a hearing on the matter on June 21, 1996, in Oxford, Mississippi, and reviewing the briefs and exhibits submitted by the parties, the court is of the opinion that the plaintiff is entitled to injunctive relief. As such, the motion of the plaintiff for a preliminary injunction shall be granted.

## FACTUAL FINDINGS

The plaintiff, Body Support Systems, Inc. ("BSS"), is an Oregon corporation that has been in business since 1987. Its principal product is a therapeutic cushion labeled the bodyCushion. A photograph of this support bolster is attached as Appendix A to this opinion. While the internal components of the bodyCushion are protected under a pat-

ent issued to the president of BSS, Tom Owens, on October 8, 1991, the overall product itself is not patented nor subject to a registered trademark.

Sometime during 1990, Owens and Michael Wingard, the president of the defendant, Blue Ridge Tables, Inc. ("Blue Ridge"), discussed the possibility of Blue Ridge tendering an offer on the manufacture of the bodyCushion.[1] Wingard claimed that, due to Blue Ridge's location and low Mississippi wages, he could produce the product much cheaper than BSS could in Oregon. Pursuant to these assertions, BSS provided Blue Ridge with the trade secrets and product specifications of the 1990 model version necessary to enable BSS to tender an offer.[2] BSS did so, however, under the protection of a confidentiality agreement executed by Wingard on behalf of Blue Ridge. In any event, these discussions did not bear fruit and BSS refused to license Blue Ridge to manufacture the bodyCushion.

In August 1995, BSS learned that a product manufactured by Blue Ridge which appeared identical to the bodyCushion was exhibited at a massage therapist trade show called the Pacific Symposium in San Diego, California. BSS ordered one of these products from Blue Ridge the following day and ordered a second one two weeks later. A photograph of this Blue Ridge product is attached as Appendix B to this opinion. Finally, in the January/February 1996 issue of the trade journal *Massage*, Owens noticed an advertisement for the product manufactured by Blue Ridge labeled "The Embracer." In the magazine, the Embracer appears to be almost indistinguishable from the 1990 version of the bodyCushion with identical listed uses and attributes. BSS filed suit against Blue Ridge in May 1996, requesting the injunctive relief which is the subject of the court's opinion today.

1. While the parties dispute which party approached the other concerning this speculative licensing agreement, these underlying facts are irrelevant to the court's decision.

2. Blue Ridge declared at the hearing before the undersigned that it had previously reverse engineered the making of the bodyCushion and that it had no need of the information provided by BSS in order to manufacture the product.

## DISCUSSION

### I. GENERAL PREMISES FOR INJUNCTIVE RELIEF

■ It is well-settled that a plaintiff must prove four elements to be entitled to preliminary injunctive relief:

1) a substantial likelihood of success on the merits;

2) a substantial threat of irreparable injury if the injunction is not issued;

3) that the threatened injury to the plaintiff outweighs any harm that may result from the injunction to the defendant; and

4) that the injunction will not disserve the public interest.

*DSC Communications Corp. v. DGI Tech., Inc.,* 81 F.3d 597, 600 (5th Cir.1996); *Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1058, 134 L.Ed.2d 202 (1996); *Cherokee Pump & Equip., Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994); *Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 163 (5th Cir.1993); *Plains Cotton Co-op Ass'n v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1259 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987); *Canal Authority of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

■ This court pays more than lip service to the apothegm that a preliminary injunction is an extraordinary remedy. *Cherokee Pump,* 38 F.3d at 249. It is "not to be granted routinely, but only when the movant, by a clear showing, carries [the] burden of persuasion." *Black Fire Fighters Ass'n v. City of Dallas,* 905 F.2d 63, 65 (5th Cir.1990) (quoting *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985)); *Cherokee Pump,* 38 F.3d at 249 ("The decision to grant a preliminary injunction is to be

Whether this is true or not is inconsequential to the present proceedings. Reverse engineering is a defense to trade secret infringement, not the trade dress infringement claim of the plaintiff in this case. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 160, 109 S.Ct. 971, 982, 103 L.Ed.2d 118 (1989); *Phillips v. Frey,* 20 F.3d 623, 629 (5th Cir.1994).

treated as the exception rather than the rule.") (quoting *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985)).

## II. TRADE DRESS INFRINGEMENT

### A. SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The first and most exhaustive element addressed by the parties at the hearing and throughout their submissions to the court is whether BSS will likely prevail on the merits of its claims against Blue Ridge. "To determine the likelihood of success on the merits, we look to the standards provided by the substantive law." *Abate v. Southern Pacific Transp. Co.*, 928 F.2d 167, 171 (5th Cir.1991) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.1990)). The plaintiff's claims include violation of

> federal statutory law prohibiting trade dress infringement (being § 43(a) of the Lanham Act); the same statute's general prohibition against unfair trade practices, passing off, dissemination of injurious falsehood, and unfair competition in general associated with the marketing of goods; the Mississippi tort prohibitions against unfair competition, passing off, and injurious falsehood; and a Mississippi common law contract action for the breach of the Agreement on the part of Blue Ridge.

Plaintiff's Memo. of Law in Supp. of Prelim. Inj. Motion. at 4–5 (internal footnote omitted). In its quest for injunctive relief, however, BSS chose to rely on only three theories: trade dress infringement, breach of contract and disparagement. The court need not address both the infringement and breach of contract claims since it finds that BSS is substantially likely to succeed on the merits of its trade dress infringement claim and the requested injunctive relief is the same under either theory.

The Fifth Circuit recently had the opportunity to address this area of the intellectual property realm:

> Trade dress refers to the image and overall appearance of a product.... The Lanham Act prohibits passing off goods or services as those of a competitor by employing substantially similar trade dress which is likely to confuse consumers as to the sources of the product.[3] ... In this circuit, there are two elements of a trade dress infringement claim. First, the trade dress of a product may be protected as an unregistered trademark if it is nonfunctional, distinctive, and has acquired a secondary meaning. Second, a finding of infringement requires a consideration of the likelihood of confusion.

*Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1350 (5th Cir. 1994) (internal citations omitted); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812–13 (5th Cir.1989). The trade dress shield to unfair competition is not limited to the external packaging of a product, but may include the product itself if the design of the product serves to identify its source and distinguish it from other products. *Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 426 n. 3 (5th Cir. 1986); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1129 (Fed.Cir.1993). Since trade dress involves the complete impression of the product as noted *supra*, it may include features such as texture, color, shape and size. *L.A. Gear*, 988 F.2d at 1129 (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)).

---

**3.** The Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

754

### 1. Functionality

■ The first requirement for protection is that the product must be nonfunctional. This does not mean that every component must be nonfunctional in order for the product to qualify. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir.1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). "The inquiry into whether . . . trade dress is functional or nonfunctional **should not be addressed to whether individual elements fall within the definition, but whether the whole collection of elements taken together are functional or non-functional.**" *Taco Cabana*, 932 F.2d at 1119. A product subject to trademark protection can be comprised of functional parts, so long as their assimilation creates a nonfunctional product. "[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *Id.* BSS does not seek protection for any individual element, but for the particular combination of elements which constitute the trade dress of the bodyCushion.

On the other hand, enhancement of the public interest in encouraging competition is the policy behind disallowing protection for functional features. *Id.*

It should suffice for a finding of functionality if protecting the trade dress threatens to eliminate a substantial swath of competitive alternatives in the relevant market. "A design would be considered de jure functional if it is 'the best *or one of a few* superior designs available.'" *Id.* at 1119 n. 6 (emphasis added by quoting court) (quoting *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 427 (5th Cir.1984)); *see also Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977–78 (2d Cir.1987) (functionality test critical to avoid upsetting patent law by indefinitely extending trade dress

protection to an aggregation of elements that would otherwise enrich the public domain after expiration of design patent). "In other words, if a certain design is essential to effective competition, it cannot be protected as a trademark." *Sicilia*, 732 F.2d at 427.

■ Blue Ridge argues, in essence, that the bodyCushion as a whole meets the test of utilitarian functionality[4]—that it is "the best or one of a few superior designs available." *Id.* The Fifth Circuit expressed its narrow view of functionality by noting that the "ultimate inquiry" which courts must make is whether affording the subject product or feature trademark protection "'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'" *Id.* at 429 (quoting *In re Morton–Norwich Prods., Inc.*, 671 F.2d 1332, 1342 (C.C.P.A. 1982)). To justify a finding of functionality, not only must the product be of a superior or optimal design,[5] but it must be "only one of a limited number of equally efficient options and free competition would be **unduly** hindered by according that design trademark protection." *Id.* (emphasis added).

The parties also dispute which party bears the burden of proving (or disproving) functionality. The circuits are apparently split on this issue. *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir.1994) (noting the Second and Seventh Circuits place the burden on the defendant to prove functionality while the Third, Eighth and Ninth Circuits place the burden on the plaintiff to disprove the same). The Fifth Circuit has not directly addressed this issue, and its implications on the matter provide little guidance. In its earlier Lanham Act opinions, the appellate court edged closer to placing the burden on the plaintiff's shoulders. *See, e.g., Sno–Wizard*, 791 F.2d at 425 n. 2 ("If the functionality hurdle is overcome, a configuration's 'distinctiveness' may qualify it for

---

**4.** Utilitarian functionality, as opposed to aesthetic functionality, focuses on whether protection of a design feature would unduly hamper competition. *Sicilia*, 732 F.2d at 427. Aesthetic functionality, on the other hand, focuses on a feature important to the commercial success of the product, other than a "mere arbitrary embellishment." *Id.*

**5.** This includes an inquiry into whether the bodyCushion's design is optimal in terms of "engineering, economy of manufacture, or accommodation of utilitarian function or performance." *Sno–Wizard*, 791 F.2d at 426 n. 3. In layman's terms, optimal is defined as "the most desirable or satisfactory." Webster's Third New International Dictionary (Unabridged) 1584 (15th ed. 1971).

protection."); *Allied Mktg.*, 878 F.2d at 813 (listing functionality with distinctiveness and secondary meaning in determination of whether protection is due for trade dress); *Taco Cabana*, 932 F.2d at 1117–18 (same). However, in a 1992 decision, the court noted in dicta that had the defendant in the case not defaulted, it might have established the functionality of the product in question as a **defense** to the plaintiff's trade dress claim. *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 66 (5th Cir.1992).

██ This court need not address on whom the burden of proof should be placed regarding the functionality of the bodyCushion. From the evidence presented, this court is of the opinion that the trade dress of the bodyCushion is not functional so as to preclude it from protection. Although certain characteristics of the bodyCushion may be functional, as that term is defined *supra*, the overall product itself is an arbitrary assimilation of features, both functional and nonfunctional. The court's findings on this issue are supported by the numerous products introduced into evidence by the plaintiff which have uses identical to those of the bodyCushion yet which do not so closely resemble the bodyCushion so as to support a trade dress infringement claim. The court finds that it is substantially likely that the bodyCushion will not be precluded from trade dress protection due to a finding of functionality.

### 2. Distinctiveness or Secondary Meaning

██ Once a product is found to be non-functional, the court turns to the second inquiry in determining whether trademark protection should be extended to it. This query is whether the product is distinctive or has acquired a "secondary meaning." *Allied Mktg.*, 878 F.2d at 813. Secondary meaning connotes that the product is so well recognized that the consuming public identifies the trade dress with a particular source. *Id.; see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11,

72 L.Ed.2d 606.(1982) ("To establish secondary meaning, a manufacturer must show that in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."). Survey evidence is the best method of proving that a product's trade dress has achieved secondary meaning. *Sno–Wizard*, 791 F.2d at 427 (noting survey evidence as "most direct and persuasive way" of demonstrating secondary meaning) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir.1983)).

Although neither party introduced any survey evidence on this point, the plaintiff did produce some evidence tending to show that the bodyCushion had established secondary meaning in the relevant market.[6] *See* Klatt Depo., June 13, 1996, at 5, 9, 161; Aff. David Cote, Jr., Apr. 11, 1996. Absent survey evidence, courts have set forth four relevant factors for courts to consider in this determination:

(1) the length and manner of [the mark's] use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the [mark] and the plaintiff's ... business; and (4) the extent to which the public actually identifies the name with the plaintiff's [service].

*Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1525 (11th Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991); *Security Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1301 (5th Cir.1985); *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1560 (11th Cir.1991).

While the court need not address secondary meaning and does not base its holding on such, the court simply notes that the plaintiff may have introduced sufficient evidence to sustain a finding of secondary meaning. With a few variations, the bodyCushion has

---

**6.** The plaintiff need not show that the public as a whole associates the bodyCushion with BBS in order to demonstrate secondary meaning. Such a connection must only be made in the minds of the *consuming* public, in this case, professionals such as massage therapists, chiropractors and physical therapists. *See Compaq Computer Corp. v. Procom Tech., Inc.*, 908 F.Supp. 1409, 1412 (S.D.Tex.1995) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.1980)); *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 128 (4th Cir.1990).

been on the market since 1987. As the body-Cushion is BSS's only product, the plaintiff has gone to the effort necessary to stay in business for almost ten years by connecting in the consuming public's mind the body-Cushion and its source, BSS. Finally, the plaintiff provided evidence by affidavit and deposition that the consuming public actually does identify the trade dress of the body-Cushion with BSS.

■ However, "[p]roof of secondary meaning is not required if a trade dress is 'sufficiently distinctive of itself to identify the producer.'" *Allied Mktg.*, 878 F.2d at 813. The Supreme Court recently agreed with the Fifth Circuit on this point. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

> The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning.

*Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2758, 120 L.Ed.2d at 624. If a product is inherently distinctive, it is capable of identifying its specific source and secondary meaning is not required. *Id.*, 505 U.S. at 773, 112 S.Ct. at 2759–60, 120 L.Ed.2d at 627. Following Judge Friendly's classic formulation, the high court set out five categories of gradually escalating distinctiveness:

> (1) generic
> (2) descriptive
> (3) suggestive
> (4) arbitrary
> (5) fanciful

*Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757, 120 L.Ed.2d at 623 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).

> The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are

deemed inherently distinctive and are entitled to protection. In contrast, generic marks—those that "refe[r]" to the genus of which the particular product is a species ...—are not registrable as trademarks.

*Id.*, 505 U.S. at 768, 112 S.Ct. at 2757, 120 L.Ed.2d at 624 (internal citations omitted).

The court finds that BSS is substantially likely to prove at trial that the bodyCushion is at least "suggestive," and thus entitled to protection. The bodyCushion is distinguishable from other therapy bolsters and indicates BSS as its source. BSS's product is sufficiently suggestive in design and appearance to meet the inherently distinctive prerequisite.

### 3. Likelihood of Confusion

■ After a product's trade dress has been found to be protected, because it is nonfunctional and either inherently distinctive or has acquired secondary meaning to the consuming public, the court determines whether its trade dress has been infringed. *Allied Mktg.*, 878 F.2d at 813. Such a determination involves a consideration of the likelihood of confusion as to the source of the products due to their substantially similar trade dress. *Engineering Dynamics*, 26 F.3d at 1350. The Fifth Circuit has set out several factors or "digits" of confusion for trial courts to consider, including:

> similarity of products, identity of retail outlets and purchasers, identity of advertising media, type (i.e. strength) of trademark or trade dress, defendant's intent, similarlity [sic] of design, and actual confusion. In addition, it is often appropriate to consider the degree of care exercised by purchasers: confusion is more likely, for example, if the products in question are 'impulse' items or are inexpensive.

*Allied Mktg.*, 878 F.2d at 813 (citing cases).[7]

■ The majority of the "digits" of confusion in this case favor a finding that confu-

---

7. The prior relationship which existed between the parties is also a relevant factor to consider in a trade dress infringement claim. *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1257 (5th Cir.1989). "Indeed, we have consistently found that a previous licensing or distributorship agreement may provide evidence of a defendant's intent to copy the plaintiff's goods." *Id.* An intent to copy is also a factor which lends weight to a finding of likelihood of confusion. *Id.* n. 5. Although BSS and Blue Ridge had no licensing agreement, they had been involved in such negotiations. In addition, the defendant admitted

sion is likely among the consuming public. The products appear very similar, if not identical. The targeted market is identical; both businesses advertise at the same trade shows and in the same journals. In addition, BSS introduced evidence of actual confusion among its purchasers. *See* Aff. Nancy Silvio, Apr. 11, 1996; Aff. David Cote, Jr., Apr. 11, 1996; Klatt Depo., June 13, 1996, at 5–6. All of these factors favor a finding of infringement.

As Blue Ridge points out, however, these products are not "impulse" products; indeed, for most purchasers they are capital investments for businesses. Furthermore, the targeted consuming public consists of a limited professional market. Both of these factors indicate that a purchase would be made with a degree of care that weighs against finding confusion likely. However, the witnesses who provided the plaintiff with examples of *actual* confusion are members of the targeted professional market. Furthermore, while the bodyCushion may be considered expensive at a price of $249.00, it is not nearly so costly as the snowball machine in *Sno–Wizard,* 791 F.2d at 425, which ran for up to $1430.00, where the Fifth Circuit found confusion unlikely.

Another factor which normally weighs against finding confusion likely is proper labeling of the product with its source. *See Blue–Bell,* 864 F.2d at 1260; *Sno–Wizard,* 791 F.2d at 429. Blue Ridge, although conceding that a few samples of its product, the Embracer, did reach the public without proper labeling, argues that the tags attached to its product adequately dispel any confusion which may arise upon a first glance of the product. This court agrees that labeling can do much to allay trade dress infringement concerns. However, in both cases cited above, the Fifth Circuit placed its reliance on the fact that the label identifying the product's source was "prominently displayed." *Blue–Bell,* 864 F.2d at 1260; *Sno–Wizard,* 791 F.2d at 429. "[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is *clearly displayed." Sno–Wizard,* 791 F.2d at 429 (citing cases) (emphasis added). This court does

not find that the small tags attached to the Embracer qualify as a prominent display of that product's origin. The more closely identical the products are, the more prominent the label should be to dispel confusion. Due to the striking similarity between the Embracer and bodyCushion, a more pronounced display of the product's source is necessary than a one or two inch label tag. The court finds that it is substantially likely that BSS will carry its burden at trial of proving likelihood of confusion. Thus, BSS meets the first, and most difficult, prong necessary for an award of injunctive relief—substantial likelihood of success on the merits.

### B. SUBSTANTIAL THREAT OF IRREPARABLE INJURY

■ BSS has demonstrated to the satisfaction of the court the existence of a substantial threat of irreparable injury if the requested injunctive relief is not awarded. "Trade dress associated with a product that has accumulated goodwill ... will almost always be an important ingredient in the salability of the product." *L.A. Gear,* 988 F.2d at 1129. As discussed *supra,* BSS is substantially likely to succeed on the merits of its trade dress infringement claim. Throughout its almost ten years in business, BSS has accumulated a substantial amount of goodwill through its one product, the body-Cushion. Owens testified that only three of the bolsters have been returned to the business for its duration. Any loss of goodwill towards the bodyCushion would undermine the financial stability of BSS in that sales of the bodyCushion constitute 90% of its income.

Due to the similarity between the appearances of the bodyCushion and the Embracer, much of the goodwill accumulated by BSS could be reflected onto Blue Ridge through the Embracer, resulting in loss of sales for BSS. And, on the other hand, any dissatisfaction with the Embracer could be inadvertently held against the bodyCushion, again due to the products' identical veneers. Goodwill, once it is lost, takes years to recoup, if it can be done even then. Further-

that he intended to copy the plaintiff's product.

*See* Depo. Karen Klatt, June 13, 1996, at 6.

more, loss of goodwill is precisely the type of irreparable harm which could be incapable of calculation in terms of money damages. *Allied Mktg.*, 878 F.2d at 810 n. 1. BSS has met the second prong for injunctive relief.

## C. THREATENED INJURY TO PLAINTIFF OUTWEIGHS HARM INJUNCTION MAY CAUSE DEFENDANT

■ This third factor also lends weight in the plaintiff's favor. While the bodyCushion is BSS's only product, sales of the Embracer constitute only a small percentage of Blue Ridge's income. Indeed, Wingard testified that Blue Ridge had only sold approximately seventy (70) specimens since it began manufacturing the Embracer in December 1995. Furthermore, any awarded injunctive relief would not completely prohibit Blue Ridge from selling any type of similar bolster, only one which was likely to infringe upon the bodyCushion's trade dress. The court finds that the threatened injury to BSS outweighs any harm injunctive relief may cause Blue Ridge.

## D. INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST

■ The public interest will be served by preserving the integrity of trademark laws. Blue Ridge argues that the public has a keen interest in competition which the award of an injunction would unduly stifle. However, "the public's interest in competition may be outweighed by the public's interest in preserving rights in intellectual property." *Allied Mktg.*, 878 F.2d at 810 n. 1. An injunction prohibiting the sale of the Embracer due to its infringement of the bodyCushion's trade dress will not curb competition of the market. Evidence adduced at the hearing before the undersigned established that several businesses compete with different products for sales in this area. This fourth and final factor weighs in favor of awarding the plaintiff the requested injunctive relief as to its trade dress infringement claim.

## III. PRODUCT DISPARAGEMENT

■ BSS also seeks a preliminary injunction prohibiting Blue Ridge from disparaging the bodyCushion. Section 43(a) of the Lanham Act provides for this cause of action long recognized as a state law tort.[8]

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce ... any false or misleading description of fact, or false or misleading representation of fact, which—

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods ...

shall be liable in a civil action....

15 U.S.C. § 1125(a). BSS produced evidence at the hearing indicating that Blue Ridge had actually disparaged the bodyCushion. *See* Aff. Nancy Silvio, Apr. 11, 1996 (testifying that Blue Ridge employee stated that bodyCushion foam would shift and separate after a year); Aff. Nancy Norris, Apr. 12, 1996 (same); Aff. Lauree Moretto, Apr. 10, 1996 (testifying that Blue Ridge employee stated that bodyCushion glue deteriorates and falls apart); Aff. John W. Lynch, Apr. 10, 1996 (same); Aff. Ken Gosling, Apr. 30, 1996 (testifying that Blue Ridge employee stated that bodyCushion glue could cause irritation to patients).

With such an impressive array of witnesses providing such damning testimony, BSS certainly meets the first injunctive factor of substantial likelihood of success on the merits of its product disparagement claim. However, the evidence weighs against BSS on the second prong—substantial threat of irreparable injury if the injunction is not issued. While BSS may have suffered irreparable injury due to such disparagement before the hearing, the court heard testimony that Blue Ridge has taken steps to completely curb such disparagement. It is the court's opinion, from the record before it, that BSS is no longer at risk of disparagement from Blue Ridge or its employees. Should that not

---

**8.** See Robertson & Clark, *The Law of Business Torts in Mississippi,* 15 Miss.C.L.Rev. 13 (1994) for an in-depth discussion of these many related state law torts.

prove to be the case, BSS may present its new evidence on this claim when this cause later comes to trial. BSS has not carried its burden with respect to its request that the court enter an injunction prohibiting Blue Ridge from disparaging BSS's bodyCushion.

### SECURITY FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.1996) (noting that the amount of security required, if any, is matter for trial court's discretion). The court is of the opinion that a bond in the amount of $10,000 is adequate for this cause.

### CONCLUSION

The court finds that the plaintiff, Body Support Systems, Inc., is entitled to injunctive relief on its trade dress infringement claim. As such, the court shall enjoin the defendant, Blue Ridge Tables, Inc., from placing in commerce its product, the Embracer. The plaintiff is not entitled to an injunction on its disparagement claim due to the court's finding that the defendant has previously dealt with its employees on this matter and the plaintiff is no longer at risk.

A separate order in accordance with this opinion shall issue this day.

### ORDER

After a thorough review of the record and a hearing before it, the court finds that the plaintiff, Body Support Systems, Inc., is entitled to injunctive relief as set out below. It is therefore ORDERED that:

1) the defendant, Blue Ridge Tables, Inc., is enjoined from selling or otherwise placing in commerce its product entitled "The Embracer."

2) the plaintiff's request for an injunction prohibiting the defendant from disparaging the bodyCushion is DENIED.

3) the plaintiff shall post a bond in the amount of $10,000 as set out in Federal Rule of Civil Procedure 65(c).

SO ORDERED.

APPENDIX A